## DECLARATION OF ROBERT COSTELLO

Robert A. Costello, pursuant to 28 U.S.C. §1746, hereby declares the truth of the following:

1.  I have personal knowledge of the facts set forth in this declaration.

2.  I am a principal in the firm of C & R Consulting, which serves as the Fund Administrator for the Publisher's-Pressmen's Welfare Fund (hereinafter referred to as the "Welfare Fund"). The Board of Trustees of the Welfare Fund are the Administrator of the Plan as defined in Section 3(16) of ERISA.

3.  The Welfare Fund is a jointly-administered, multi-employer, labor-management trust fund established under a declaration of trust and maintained pursuant to various collective bargaining agreements. The Welfare Fund provides hospital, medical, pharmacy and related benefits to employees of contributing employers in the newspaper industry in New York City.[1] The benefits provided by the Welfare Fund are set forth in a Summary Plan Description Booklet. (A copy of the relevant parts of the SPD are attached hereto as Exhibit "A")

4.  The benefits are funded through two (2) separate sources. The first source of funding is through employer contributions that are made to the Welfare Fund by employers (i.e. newspapers in the New York metropolitan area) that are signatory to collective bargaining agreements with the New York Newspaper Printing Pressmen's

---

[1] The Welfare Fund is signatory to an agreement with Empire Blue Cross/Blue Shield through which the benefits are provided to the Fund's eligible participants and their dependents.

Union Local No. 2 (the "Union"). The Signatory Employers consist of the New York Post, The New York Daily News and The New York Times. The second source of funding is through participant contributions that are made by those members of the Union that participate in the Fund and elect to receive benefits. The employee contributions have historically consisted of per-shift contributions that have been deducted from the participant's weekly paycheck and remitted by the Signatory Employers to the Welfare Fund on a monthly basis or paid directly by the participant to the Welfare Fund.[2]

     5.     In 2003, the Trustees began to consider the possibility of modifications to the Plan benefits or an increase of participant contributions because of rising health care costs. In December of 2003, after consulting with a series of outside consultants, the Board of Trustees elected to increase the participant contributions, effective March 28, 2004, in order to maintain the level of benefits, as follows: (a) increasing the existing participant contribution by approximately 33%, and (b) requiring an additional participant contribution of 14.04 per shift. Thus, for example, the participant

---

[2]     In September of 2003, and as a result of an audit that had recently been conducted at one of the Signatory Employers, the Fund realized that there were participants who continued to receive benefits despite the fact that they had not authorized a payroll deduction to pay the participant contribution and had not made the participant contributions to the Fund. Mr. Paulino was among those employees. As a result, the Trustees adopted a resolution at the September 2003 meeting that effective January 1, 2004, a participant would only be eligible for benefits if they made the contributions to the Welfare Fund through a payroll deduction authorization or by direct payment. (A copy of the relevant portions of the September 30, 2003 minutes are attached hereto as Exhibit "B")

contribution at the New York Post, effective March 28, 2004, was increased from $11.80 per shift to $30.90 per shift.

6.    In order to attempt to minimize the economic impact upon the participants, the Union negotiated a series of agreements with the New York Post, New York Times and New York Daily News to establish cafeteria plans through which the participant contributions could be made on a pre-tax basis.  While the Union reached agreement with the New York Times and the New York Daily News very quickly, it did not reach agreement with the New York Post until June 2004.

7.    On June 23, 2004, the Trustees held a meeting, during which they adopted a motion, establishing certain dates by which (a) the participants would have to enroll in the Internal Revenue Code §125 Plans (the "Cafeteria Plans") or begin making the participant contributions on a post-tax basis, (b) the participants would have to pay the monies owed from March 28, 2004 up through the date that a cafeteria plan authorization was executed.  (A copy of the relevant portions of the minutes from the June 23, 2004 meeting is attached hereto as Exhibit "C")

8.    Consistent with the Trustees' motion, and on July 9, 2004, a letter was sent to each participant (including Daniel Paulino) which (a) reminded the participant that the Board of Trustees had implemented an increase in participant contributions to the Fund, effective March 28, 2004, (b) advised that all past due contributions had to be made by October 31, 2004, (c) advised that the failure by a participant to pay the increased participant contribution would result in the termination of benefits for the participant and eligible dependents, and (d) advised that the contributions could be

made through enrollment in a cafeteria plan established by the participant's employer.[3] (A true copy of the letter is attached as Exhibit "D")

9.      In January of 2005, I was notified that Mr. Paulino had refused to execute an authorization to participate in the New York Post 125 Plan. In addition, Mr. Paulino had also failed to make any post-tax employee contributions to the Welfare Fund for benefits. As a result, Mr. Paulino was no longer eligible for benefits. The Court should be advised that based upon my review of a recent audit of NY Post participant contributions, it appears that Paulino has not made participant contributions at any time since he became employed at the New York Post and during the entire time that the Welfare Fund has been providing him with benefits.

10.      Even though a notice of continuation coverage was not required, the Welfare Fund sent Mr. Paulino an election notice, by mail, on February 7, 2005. (A copy of the notice is attached hereto as Exhibit "F").  To date, Mr. Paulino has not sought a review by the Trustees of the Welfare Fund's determination that he was not eligible for benefits based upon his failure to make the participant contributions, as required under the terms of the Plan. (See Exhibit "A" at pages 55-56)

---

[3]      On July 9, 2004, the Union issued a notice to all of its members, advising of the availability of the Cafeteria Plans and advising of the enrollment cut-off dates. (A copy of the notice is attached as Exhibit "E")

I declare the truth of the following.  Executed at New York, New York on July 28, 2005.

Robert A. Costello

# Exhibit "A"



Dear Member

The Board of Trustees of the Pressmen's – Publishers' Benefits Funds is pleased to present you with this updated description of health and pension benefits for eligible active employees in Local No. 2 jurisdiction, and their eligible dependents, eligible retirees younger than age 65, and their eligible dependents younger than age 65.

As you look through this booklet, you will learn how you become eligible for benefits, what your benefits are and how you claim them. Be sure to share this booklet with members of your family. We have tried to make it as easy to read as possible by presenting the information about your benefits in everyday language.

Please keep in mind that the booklet presents only a summary of your health and pension benefits; it is not a substitute for the insurance policies or pension plan. If there should be any difference between this booklet and the policies and plan, the actual terms and conditions of the policies and plan will have the final say.

If you have any questions about your benefits, please feel free to contact the Benefits Fund office at 212-869-5994 or fax to 212-869-2233.

With our best regards,

Board of Trustees

John M. Heffernan
Joseph Connor
William Murdoch
Jay Sabin
Jeff Zomper

# PRESSMEN'S - PUBLISHERS'
# BENEFITS FUND
# SUMMARY PLAN DESCRIPTION

Effective June 1, 2000

# TABLE OF CONTENTS

INTRODUCTION ................................................................................. 1
    WHAT THIS SUMMARY PLAN DESCRIPTION TELLS YOU ................................... 1
    SUGGESTIONS FOR USING THIS SUMMARY PLAN DESCRIPTION ...................... 2
    WHOM TO CALL FOR HELP OR INFORMATION ............................................. 4
    OVERALL CONTENTS OF THIS SUMMARY PLAN DESCRIPTION ....................... 4

ELIGIBILITY ................................................................................. 5
    ELIGIBILITY FOR COVERAGE ................................................................. 5
    ENROLLMENT FOR AND START OF COVERAGE ......................................... 6
    WHEN COVERAGE ENDS .................................................................. 11

MEDICAL EXPENSE COVERAGE ............................................................ 15
    ELIGIBLE MEDICAL EXPENSES ............................................................ 15
    DEDUCTIBLES .................................................................................. 16
    COINSURANCE ................................................................................ 17
    COPAYMENT .................................................................................... 18
    OUT-OF-POCKET EXPENSES .............................................................. 18
    MAXIMUM PLAN BENEFITS ................................................................. 19
    SCHEDULE OF MEDICAL BENEFITS ...................................................... 20

BENEFITS SUMMARY ......................................................................... 22

MEDICAL NETWORKS ........................................................................ 26
    MEDICAL NETWORKS ........................................................................ 26
    DIRECTORIES OF BlueChoice PPO PROVIDER ........................................ 27

UTILIZATION MANAGEMENT ................................................................. 28

EXCLUSIONS: EXPENSES NOT COVERED BY THE MEDICAL PLAN ......... 32
    GENERAL EXCLUSIONS APPLICABLE TO ALL MEDICAL
    SERVICES AND SUPPLIES .................................................................. 33
    EXCLUSIONS APPLICABLE TO SPECIFIC MEDICAL
    SERVICES AND SUPPLIES .................................................................. 38

DENTAL BENEFITS ........................................................................... 45

OPTICAL BENEFITS .......................................................................... 49

LIFE INSURANCE BENEFIT ................................................................. 51



i

**CLAIMS INFORMATION** ............................................................................. **52**

    HOW MEDICAL BENEFITS ARE PAID................................................ 52

    HOW TO FILE A CLAIM ...................................................................... 54

    TIME LIMIT FOR FILING MEDICAL CLAIMS........................................ 55

    REVIEW PROCEDURE IF YOUR CLAIM IS DENIED ........................... 55

    DISCRETIONARY AUTHORITY OF PLAN ADMINISTRATOR AND

    DESIGNEES......................................................................................... 56

    FACILITY OF PAYMENT...................................................................... 57

**DUPLICATE COVERAGE**........................................................................... **58**

    HOW DUPLICATE COVERAGE OCCURS ........................................... 58

    COORDINATION OF BENEFITS (COB): COVERAGE UNDER

    MORE THAN ONE GROUP HEALTH PLAN.......................................... 59

    MEDICARE AND OTHER GOVERNMENT PROGRAMS........................ 66

    WORKERS' COMPENSATION .............................................................. 69

    THIRD PARTY LIABILITY..................................................................... 69

**WHEN COVERAGE ENDS** ......................................................................... **73**

    EXTENSION AND CONTINUATION OF COVERAGE IN GENERAL ...... 73

    EXTENSION OF COVERAGE............................................................... 73

    CONTINUATION OF COVERAGE (COBRA) ......................................... 75

    CERTIFICATION OF COVERAGE WHEN COVERAGE ENDS .............. 79

**OTHER INFORMATION**.............................................................................. **81**

**DEFINITIONS**............................................................................................. **89**

# INTRODUCTION

## WHAT THIS SUMMARY PLAN DESCRIPTION TELLS YOU

A. This Summary Plan Description describes the health care — medical, dental, optical —, life insurance and loss of time benefits for employees of Contributing Employers to the Pressmen's-Publishers' Benefits Fund. The Plan described in this Summary Plan Description is effective as of June 1, 1999.

B. This Summary Plan Description will help you understand the health, life insurance and loss of time benefits provided through the Pressmen's-Publishers' Benefits Fund and how to use them well. You should review it and show it to those members of your family who are or will be covered by the Plan. It will give all of you an understanding of:

- the coverages provided;
- the procedures to follow in submitting claims; and
- your responsibilities to provide necessary information to the Plan.



Be sure to read the Exclusions and Definitions chapters. Remember not every expense you incur for health care is covered by the Plan.

C. ALL PROVISIONS OF THIS SUMMARY PLAN DESCRIP-TION CONTAIN IMPORTANT INFORMATION. However, some provisions include the notation "VERY IMPORTANT INFORMATION" in their headings. This is because they explain very important obligations that you must satisfy in order to preserve your rights under the Plan, or because they explain certain very important limitations of the liability of the Plan and its Trustees, and the Employer. All other provisions explain your rights under the Plan and explain limitations of liability of the Plan. *THE USE OF THIS NOTA-TION IN THE HEADINGS OF SOME PROVISIONS SHOULD NOT LEAD YOU TO ASSUME THAT OTHER PROVISIONS DO NOT CONTAIN VERY IMPORTANT INFORMATION.* If you have any questions about your cov-

1

erage or your obligations under the terms of the Plan, be sure to contact the Fund Office for assistance. A Quick Reference to sources of help or information about the Plan appears below.

D. As the Plan is amended from time to time, the Welfare Fund's Plan Administrator will send you information explaining the changes. If those later notices describe a benefit or procedure that is different from what is described here, you should rely on the later information.

E. Be sure to keep this document, along with notices of any Plan changes, in a safe and convenient place where you and your family can find and refer to them. If you lose this document, please contact the Fund Office to receive another copy.

## SUGGESTIONS FOR USING THIS SUMMARY PLAN DESCRIPTION

This Summary Plan Description provides a great deal of detail about your Plan. We suggest that you and your covered family members take the following steps to become familiar with what is included in this document:

A. Read through this Introduction and look at the Table of Contents that immediately precedes it. This Introduction lists the topics covered by each of the chapters, so you will understand the broad outline of this summary description of the Plan. The Table of Contents provides you with an outline of the topics covered within each chapter.

B. Review the chapters that describe the medical, dental, optical, life insurance and loss of time coverages in more detail. If you do not want to read each chapter thoroughly, at least become familiar with the contents. As you look through the text, you will notice that there are examples, charts and tables to help clarify the key provisions and more technical details of the coverages.

C. As you review each chapter describing coverage, you should:

1. Refer to the Definitions chapter at the back of the document. Words that appear throughout the text with initial capital letters have specific meanings that are set forth in the Definitions section. You may also encounter technical terms that may or may not have initial capital letters, but that are also defined in the Definitions chapter. As you consult this Summary Plan Description, when you see words or terms with initial capital letters, be sure you understand their meanings by consulting the Definitions section.

2. Refer to the Other Information chapter for information regarding your rights under the law and with respect to the Plan.

3. Refer to the Claims Information chapter to find out what you must do to file a claim and how to seek review if you are dissatisfied with a claims decision.

4. Refer to the chapter on Duplicate Coverage of Medical Expenses for information regarding the handling of situations where you have coverage under more than one group health care plan, Medicare and other government plans (including personal injury protection under mandatory no-fault automobile insurance coverage), workers' compensation, or where you can recover your medical expenses from a third party who wrongfully caused the injury or illness giving rise to those expenses.

5. If coverage ends for you or for a covered Spouse or Dependent Child, see the chapter on When Your Medical Coverage Ends. This chapter explains when your coverage may be extended, or (with respect to your medical coverage) converted to an individual policy of medical expense insurance.

and/or Investigational service or supply, at the time of the determination:

1. is proved to be safe with promising efficacy; and

2. is provided in a clinically controlled research setting; and

3. uses a specific research protocol that meets standards equivalent to those defined by the National Institutes of Health (NIH),

For the purpose of this definition, the term "life-threatening" is used to describe illnesses, injuries or conditions that are more likely than not to cause death within one year of the date of the request for treatment.

### Federal Legend Drugs

See the definition of Prescription Drugs.

### Food and Drug Administration (FDA)

The U.S. government agency responsible for administration of the Food, Drug and Cosmetic Act and whose approval is required for certain Prescription Drugs and other medical services and supplies to be lawfully marketed.

### Formulary

A list of drug products, including strength and dosages, available for use by Plan Participants.

### Fund Administrator

Fund Administrator means the Board of Trustees, Pressmen's-Publishers Welfare Fund, or any committee(s) or person(s) duly appointed by the Trustees to administer the Plan and Trust. The Board of Trustees shall be the "administrator" as that term is defined in Section 3(16) of ERISA

### Handicap or Handicapped (Physically or Mentally)

The inability of a person to be self-sufficient as the result of a condition such as mental retardation, cerebral palsy, epilepsy or

# CLAIMS INFORMATION

## HOW MEDICAL BENEFITS ARE PAID

**A.  Payment of Medical Benefits in General**

1. All Plan Benefits are considered for payment on the receipt of a written proof of claim. A completed claim form usually contains the necessary proof of claim but sometimes additional information or records may be required. However, if medical services are provided through the BlueChoice Program, your Health Care Provider will submit proof of claim directly to the Plan.

2. Generally, Plan Benefits payable on account of expenses for a Hospital or Specialized Health Care Facility will be paid directly to the institution providing the services. Likewise, Plan Benefits payable on account of expenses for Surgery will be paid directly to the surgeon or anesthesiologist providing the services. However, if, at the time you submit your claim, you furnish evidence acceptable to the Plan Administrator or its designee that you or your covered Dependent paid some or all of those charges, Plan Benefits will be paid to you up to the amount you paid for those services. When Deductibles, Coinsurance or Copayments apply, you are responsible for paying your share of the charges.

3. If medical services are provided through BlueChoice, the Health Care Provider may submit the proof of claim directly to the Plan, or may complete the necessary claim form and return it to you for submission to the Plan. However, you will be responsible for the payment to the PPO Health Care Provider of any applicable Copayment.

**B.  Qualified Medical Child Support Orders (QMCSOs)**

A Qualified Medical Child Support Order (QMCSO) may require the Plan to pay Plan Benefits on account of expenses incurred by or on behalf of the Dependent Child(ren)

covered by the Plan either to the Health Care Provider who rendered the services or to the custodial parent of the Dependent Child(ren). If coverage of the Dependent Child(ren) is actually provided by the Plan, and if the Plan Administrator or its designee determines that it has received an QMCSO, it will pay Plan Benefits on account of expenses incurred by or on behalf of the Dependent Child(ren) to the extent otherwise covered by the Plan as required by that QMCSO. For additional information regarding QMCSOs, see the Eligibility chapter of this document.

### C. When You Must Repay Plan Benefits

If it is found that the Plan Benefits paid by the Plan are too much because:

1. some or all of the medical expenses were not paid or payable by you or your covered Dependent; or

2. you or your covered Dependent received the money to pay some or all of those medical expenses from a source other than the Plan; or

3. you or your covered Dependent achieve any recovery whatsoever, through a legal action or settlement in connection with any sickness or injury alleged to have been caused by a third party, regardless of whether or not some or all of the amount recovered was specifically for the medical expenses for which Plan Benefits were paid; or

4. the Plan erroneously paid Benefits to which you were not entitled under the terms and provisions of the Plan, then

   the Plan will be entitled to a refund from you or your Health Care Provider of the difference between the amount of Plan Benefits actually paid by the Plan for those expenses and the amount of Plan Benefits that should have been paid by the Plan for those expenses based on the actual facts. For additional information on the procedures that may be followed by the Plan to recover these amounts, see the provi-

sion regarding third-party liability in the chapter discussing Duplicate Coverage of Medical Expenses.

## HOW TO FILE A CLAIM

### A. Where to Get Claim Forms

You can get claim forms from the Fund Administrator at:

Pressmen's-Publishers' Benefits Funds
1501 Broadway, Suite 1724
New York, N.Y. 10036
Telephone number (212) 869-5994

### B. How to Complete a Claim Form

1. Complete the employee part of the claim form in full. Answer every question, even if the answer is "none" or "not applicable (N/A)."

2. The instructions on the claim form will tell you what documents or medical information are necessary to support the claim. Your Physician can complete the Health Care Provider part of the claim form, or you can attach the bill for professional services if it contains all of the following information:

   - A description of the services or supplies provided.
   - Details of the charges for those services or supplies.
   - Diagnosis.
   - Date(s) the services or supplies were provided.
   - Patient's name.
   - Provider's name, address, phone number, professional degree or license, and federal tax identification number.

3. Please review your bills to be sure they are appropriate and correct. Report any discrepancies in billing to the claims administrator. This can reduce costs to you and the Plan.

54

4. Complete a separate claim form for each person for whom Plan Benefits are being claimed.

### C. Where to Send the Claim Form

Send the completed claim form and any other required information to:

Pressmen's-Publishers' Benefits Funds
1501 Broadway, Suite 1724
New York, N.Y. 10036
Telephone number (212) 869-5994

## TIME LIMIT FOR FILING MEDICAL CLAIMS

All medical claims must be submitted to the Plan within one year from the date of service. No Plan Benefits will be paid for any claim not submitted within this period.

## REVIEW PROCEDURE IF YOUR CLAIM IS DENIED



### A. Written Notice of Denial of Claim

The Plan will notify you in writing if payment of your claim is denied in whole or in part. It will explain the reasons why, with reference to the Plan provisions on which the denial was based.

### B. When Additional Information Is Needed

When applicable, you will be told what additional information is required from you and why it is needed.

### C. Request for Review of Denial of Claim

You will be told what steps you may take to submit your claim for review and reconsideration. Your request for review or reconsideration must be made in writing to the office where the claim was originally submitted within 60 days after you receive notice of denial. The review process works as follows:

1. If your claim is denied, or if you disagree with the amount paid on a claim, you may ask for a review.

2. You have the right to review documents applicable to the denial and to submit your own comments in writing.

3. Your claim will be reviewed by a different person who is not subordinate to the one who originally denied the claim. If any additional information is needed to process your request for review, it will be requested promptly.

4. The decision on any review of your claim will be given to you in writing. It will explain the reasons for the decision, with reference to the applicable provisions of the Plan.

5. Ordinarily, a decision will be reached within 90 days after receipt of your request for review. However, in special circumstances, up to an additional 60 days may be necessary to reach a final decision. You will be advised in writing within the 90 days after receipt of your request for review if an additional period of time will be necessary to reach a final decision.

**D. Limitation on When a Lawsuit May Be Started**

You may not start a lawsuit to obtain benefits until after you have requested a review and a final decision has been reached on review, or until 90 days have elapsed since you filed a request for review if you have not received a final decision or notice that an additional 60 days will be necessary to reach a final decision. No lawsuit may be started more than three years after the time proof of claim must be given.

# DISCRETIONARY AUTHORITY OF PLAN ADMINISTRATOR AND DESIGNEES

The Plan Administrator (or, where applicable, any duly authorized delegee of the Plan Administrator) shall have the exclusive right, power, and authority, in its sole discretion, to administer, apply and interpret the Plan and any other documents and to decide all factual and legal matters arising in connection with

the operation of the Plan. Without limiting the generality of the foregoing paragraph, the Plan Administrator (or, where applicable, any duly authorized delegee of the Plan Administrator) shall have the sole and absolute discretionary authority to:

- take all actions and make all decisions (including factual decisions) with respect to the eligibility for, and the amount of, benefits payable under the Plan to Employees or Participants or their beneficiaries;

- formulate, interpret and apply rules, regulations, and policies necessary to administer the Plan;

- decide questions, including legal or factual questions, relating to the calculation and payment of benefits, and all other determinations made, under the Plan;

- resolve and/or clarify any factual or other ambiguities, inconsistencies and omissions arising under this Agreement, the Plan or other Plan documents; and

- process, and approve or deny, benefits claims and rule on any benefit exclusions.

## FACILITY OF PAYMENT

If the Plan Administrator or its designee determines that you cannot submit a claim or prove that you or your covered Dependent paid any or all of the charges for health care services that are covered by the Plan because you are incompetent, incapacitated or in a coma, the Plan may, at its discretion, pay Plan Benefits directly to the Health Care Provider(s) who provided the health care services or supplies, or to any other individual who is providing for your care and support. Any such payment of Plan Benefits will completely discharge the Plan's obligations to the extent of that payment. Neither the Plan, Plan Administrator, claim administrator nor any other designee of the Plan Administrator will be required to see to the application of the money so paid.

57

# Exhibit "B"

Jul 22 05 12:43p                                                         p.8

# Pressmen's-Publishers' Benefit Funds

**Publishers'- Pressmens' Welfare Fund Trustee Meeting**
**September 30, 2003**

<u>Employer Trustees:</u>                <u>Union Trustees:</u>

Jay Sabin                            Joseph Connor
Jeff Zomper                          William Loftus
                                     William Murdoch

<u>Also Present:</u>
Robert A. Costello, Fund Administrator
Neal Schelberg, Proskauer Rose
Eric Fisher, Proskauer Rose
Barry Warner, Proskauer Rose (for a portion of the meeting)
Barry Levy, Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox
Phil Dellocono, Investment Performance Services
Tony Moschella, The Savitz Organization, Consultant
Peter Riemer, First Actuarial Consulting Team
Rocco Totino, Pustorino, Puglisi & Co.

Time: 1:30 p.m.

The meeting was held at Proskauer Rose LLP, 1585 Broadway, New York, NY.

A motion was made by Mr. Sabin, Chairman, and seconded by Mr. Loftus, Secretary, to adopt the agenda. The motion was approved.

A motion was made by Mr. Sabin and seconded by Mr. Loftus to approve the minutes of June 17, 2003. The motion was approved.

**Publishers'- Pressmens' Welfare Fund**
**September 30, 2003**
**Page 2**

CONTINUING MIN 01-08  Dependent Eligibility.  Mr. Levy reviewed with the Trustees that on June 20, 2003, letters were sent to six Participants who did not supply proper documentation with respect to their dependents demanding reimbursement for claims paid on behalf of those ineligible dependents.  To date, no reimbursements have been made to the Fund.  After a discussion took place, a motion was made by Mr. Sabin and seconded by Mr. Loftus to direct Fund Counsel to send those six Participants a second notice.  The motion was approved.

The Trustees then discussed amending the definition of eligibility in the Plan's Summary Plan Description ("SPD").  The definition would be amended to add that no member will be eligible for benefits under the Plan if after a 30-day grace period, the member has not made the required employee contributions.  After a discussion took place, a motion was made by Mr. Sabin and seconded by Mr. Zomper that, effective January 1, 2004, a Participant will be eligible for benefits under the Plan only if (i) he works at least 39 shifts in a quarter; and (ii) all required employee contributions are remitted to the Fund on a timely basis.  The motion was approved.

Mr. Costello advised the Trustees that, as of September 3, 2003, 32 Participants on a July 1, 2003 priority list at the New York Post did not sign their Payroll Authorization for Employee Welfare and Pension Contribution forms.  After a discussion took place, a motion was made by Mr. Sabin and seconded by Mr. Loftus to notify the affected Participants that they will not be eligible for benefits after January 1, 2004, if they remain in violation of the foregoing policy by failing to sign the payroll authorization forms.  The motion was approved.

# Exhibit "C"

Jul 22 05 12:46p

# Pressmen's-Publishers' Benefit Funds

**Pressmen's – Publishers' Welfare Plan Trustee Meeting**
**June 23, 2004**

<u>Employer Trustees:</u>

Jay Sabin
Lawrence Marcus

<u>Union Trustees:</u>

Joseph Connor
William Loftus
William Murdoch

Also Present:

Robert A. Costello, Fund Administrator
Neal Schelberg and Eric Fisher, Proskauer Rose LLP
Barry Levy, Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox
Gina Kramer, Observer, The Daily News

Time: 3:00 p.m.

The meeting was held at Proskauer Rose LLP, 1585 Broadway, New York, NY.

A motion was made by Mr. Loftus, Chairman, and seconded by Mr. Sabin, Secretary, to adopt the agenda. The motion was approved.

A motion was made by Mr. Loftus and seconded by Mr. Sabin to approve the minutes of January 26, 2004. The motion was approved

**Pressmen's – Publishers' Welfare Plan**
**June 23, 2004**
**Page 2**

CONTINUING MIN 02-04   Contribution Charges (Cafeteria Plan).   Mr. Costello reported that the New York Times and the Daily News each has given the Fund Office the necessary information to determine which participants have enrolled in the cafeteria plans, and how much money remains owed by the participants to the Fund.  Mr. Costello informed the Trustees that the New York Post has not furnished the necessary data electronically to the Fund Office.  The Post has told Mr. Costello that it has a target implementation date for their cafeteria plan of July 6, 2004.

Mr. Costello reported to the Trustees that he has been advised that several New York Times employees attempted to sign up for the cafeteria plan, but their applications were held up for administrative reasons.  Mr. Sabin stated that participants who have tried to sign up, but could not for administrative reasons should be treated differently than a participant who continues to refuse to contribute the proper amounts to the Fund.

Mr. Levy suggested that the Trustees set a target date for participants to begin making the proper payments to the Fund, either via the cafeteria plans or via after-tax contributions. Participants who do not begin payments by the target date, will lose eligibility.  Mr. Levy also suggested that the Trustees develop a payment plan, whereby all participants that have started making the correct contributions be permitted to catch-up on all of the monies that are still due to the Fund.

**Pressmen's – Publishers' Welfare Plan**
**June 23, 2004**
**Page 3**

After a discussion took place, a motion was made by Mr. Sabin and seconded by Mr. Loftus, to authorize the Administrator to request that the contributing employers agree to extend the enrollment windows under their respective cafeteria plans to the following dates:

> The New York Times Cafeteria Plan – August 1, 2004

> Daily News Cafeteria Plan – August 1, 2004

> New York Post Cafeteria Plan – August 14, 2004

It was noted that in order to participate in the cafeteria plan, a participant must sign a payroll authorization form at each employer where he works. The Trustees agreed that participants who do not begin making the proper payments to the Fund by the date that corresponds with their employer's extended deadline, will automatically lose their Fund eligibility for themselves and for their dependents until the first of the month following the date that the participant begins making the proper per shift contribution to the Fund (either via pre-tax or after-tax monies).

The Trustees also resolved to set a deadline of October 31, 2004 for the Fund to receive payment of **all** outstanding contributions owed by Plan participants (either on a pre-tax or on a post-tax basis.) Participants who have not paid their arrearages to the Fund in full will automatically lose eligibility for benefits under the Fund for themselves and for their dependents on November 1, 2004, and will remain ineligible for coverage under the Fund until the first day of the month following the date that the participant remits all delinquent contributions to the Fund. The Trustees agreed that this deadline is firm and that they will not be extended further. The motion was approved.

The Trustees instructed co-counsel to draft notices to the participants, alerting them of these resolutions, so that they may comply without losing eligibility for benefits.

Upon motion duly made and seconded, the meeting was adjourned 5:00 p.m.

# Exhibit "D"

# Pressmen's-Publishers' Benefit Funds

July 9. 2004

Dear Plan Participant:

As you know, beginning on March 28, 2004, the Board of Trustees implemented an increase in the amount of required participant contributions to the Fund. As you were advised, the failure of a participant to pay these increased contributions will result in the termination of such participant's (and, if applicable, his dependents') coverage under the Fund. This per shift contribution requirement is in addition to the existing 39 shift per eligibility period requirement.

As noted above, the employee contribution increases were effective beginning on March 28, 2004. All money due and owing to the Fund from March 28, 2004 must be paid by **October 31, 2004.** If all such payments are not made by the October 31, 2004 date, coverage under the Fund for yourself (and, if applicable, your dependents) will be terminated effective **November 1, 2004.** Your payments to the Fund must commence on the date(s) (set forth below) that your employer(s) has established for enrolling in its "cafeteria plan."

In the event of your termination of coverage, you will continue to be ineligible for benefits under the Fund until the first day of the month following the date that all of your delinquent payments are made. For information relating to your options for payment, please contact the Union office at (212) 691-2862.

We understand that each of the contributing employers to the Fund has established a "cafeteria plan", which will permit you to make your required contributions to the Fund on a pre-tax basis. We have been advised that the dates by which you can enroll (by signing a payroll authorization form(s) with your employer(s)) in the respective cafeteria plans are as follows:

> ➤ The New York Times Cafeteria Plan – August 1, 2004

> ➤ The Daily News Cafeteria Plan – August 1, 2004

> ➤ The New York Post Cafeteria Plan – August 14, 2004

1501 Broadway, Suite 1724 • New York, NY 10036
Telephone (212) 869-5994 • Fax (212) 869-2233

As noted above, in order to be eligible for benefits under the Fund, you must begin to pay your employee contributions to the Fund by the date(s) set forth above for enrolling in the cafeteria plan established by your employer(s), regardless of whether you pay on a pre-tax basis through a cafeteria plan or through after-tax payments. In order to participate in the cafeteria plan, it will be necessary to sign a payroll authorization form at each employer where you work.

If you have any questions, please contact the Fund Office at (212) 869-5994.


Sincerely,



Robert A. Costello
Fund Administrator

# Exhibit "E"

Jul 22 05 12:49p                                                        p.22
07/09/2004  12:33   1-212-691-2962        NY PRESSMENS UNION        PAGE 01



# NEW YORK NEWSPAPER PRINTING PRESSMEN'S UNION NUMBER TWO

275 7th Avenue, Suite 1500
New York, N.Y. 10001

Telephone (212) 691-2862                           Fax (212) 691-2962

July 9, 2004

To:         All Members

From:       Office of the President: William E. Loftus          **PLEASE POST**

Re:         Cafeteria Plans – Cut off dates

Dear Sister and Brother Members:

The New York Times, The Daily News and The New York Post have each established a "cafeteria plan", which will permit you to make your required contributions to the Welfare Fund on a pre-tax basis. Although many of our members have already elected to participate in the cafeteria plans and have signed and submitted the required payroll authorizations, we would remind you that the cut-off dates for enrollment in each of the respective cafeteria plans are as follows:

> The New York Times Cafeteria Plan – August 1, 2004
> The Daily News Cafeteria Plan – August 1, 2004
> The New York Post Cafeteria Plan – August 14, 2004

In order to participate in the cafeteria plan, it is necessary for you to sign a payroll authorization form, and to return it to the individual that is responsible for processing the authorization at the facility. You should sign and submit a payroll authorization form to each employer where you presently work as a regular situation holder and for each employer where you actually or intend to work as an outsider. In the event that you fail to sign and submit the authorization forms before the cut-off date, you may be disqualified from participating in the cafeteria plan until there is another open enrollment period.

For your convenience, we have enclosed copies of the authorization form for each Employer. To the extent that you have not signed and submitted the authorization forms, we urge you to do so immediately so that you can take advantage of the cafeteria plan.

If you have any questions, please contact the Union at (212) 691-2862.

Sincerely and Fraternally,

*William E. Loftus*

William E. Loftus
President

WEL:tw
opeiu/153
AFL-CIO

# Exhibit "F"

# Pressmen's-Publishers' Benefit Funds

February 7, 2005

Mr. Daniel Paulino
225 Seventh Avenue
New York, NY 10001

Dear Mr. Paulino:

This is to advise you that your health coverage under the Publishers'- Pressmen's Benefits Fund will terminate (or has terminated) as of January 1, 2005. However, you have the right to continue the present group health coverage for yourself and your eligible dependents covered under the Plan beyond this date, if you elect to do so in writing on time, and send in all monthly premiums on time. This extended coverage is called "COBRA continuation coverage". An Election Form is attached.

Even if you choose not to elect COBRA continuation coverage, each of your other family members covered under the Plan has an independent right to elect COBRA continuation coverage. In this case, it is important that each family member read this Notice.

## DEADLINE FOR ELECTION OF COVERAGE

If COBRA continuation coverage is desired, the attached Election Form must be completed and mailed or delivered to the Fund Administrator no later than 60 days from the date of this Notice. If you do not send in the Election Form by that date, you will lose your right to elect COBRA continuation coverage.

## PREMIUM RATES

The monthly premium will depend on how many persons are covered and what type of benefits are chosen. If only one person will be covered, the Individual rates will apply. Family rates apply if COBRA continuation coverage is elected for two or more people in the family.

There is also a choice between Core Benefits and All Health Benefits (those terms are explained below). A family (2 or more people) can choose to be covered in one of three ways, as follows:

    (1)    Everyone covered by Core Benefits only;
    (2)    Everyone covered by All Health Benefits; or
    (3)    One family member covered by All Health Benefits, and all other family members covered by Core Benefits only.

Your provider is **Empire Blue Cross and Blue Shield and the current monthly rate is $971.59;** you must choose your election on the attached Election Form.

The rates shown are guaranteed until December 31, 2005 unless there is a change in benefits provided to active employees before that time, **or you meet the special disability extension rules (see "Duration of Coverage" below).** You will be notified of any change in rates and the reason for the change.

1501 Broadway, Suite 1724 • New York, NY 10036
Telephone (212) 869-5994 • Fax (212) 869-2233


## DEADLINE FOR PAYMENT OF PREMIUMS

Although you have 60 days to make your election, COBRA continuation coverage begins from the date your coverage would have terminated if you had not chosen COBRA continuation coverage. Therefore, the first premium payment may be made retroactively, and is for the period beginning January 1, 2005. So you should calculate your first premium payment to cover the number of months from the termination date through and including the month you send in the check. It must be paid no later than 45 days after the date you mail your signed Election Form to the Fund. However, it is advisable to include the premium payment with the Election Form in order to receive prompt payment on claims. All checks should be made payable to Publishers'- Pressmen's Benefits Fund.

Subsequent monthly payments will be due on the first day of the calendar month for which coverage is to be provided. However, you have a grace period of 30 days. While payment within the grace period will maintain your coverage, no claims incurred in a month will be paid until the premium for that month is received.

You will not receive any further notice of premiums due unless there is a change in the rates due to the expiration of the current rate guarantee period or benefits are changed or you are disabled and eligible for Social Security (see below). It is your responsibility to pay premiums on a timely basis. If the premium due for any month is not received by the due dates stated in this notice, coverage will automatically terminate as of the end of the period for which the last premium was paid.

## TYPE OF BENEFITS

Your COBRA continuation coverage may consist of either (A) "ALL HEALTH BENEFITS" UNDER THE PLAN -hospitalization, medical-surgical, dental, optical, or (B) "CORE BENEFITS" - the benefits described in (A), but not optical. In either case, coverage does not include life insurance. You should indicate your choice on the Election Form.

If you elect COBRA continuation coverage and subsequently add a dependent, that dependent can be covered.

## DURATION OF COVERAGE

If COBRA continuation coverage is elected for an individual, and the premiums are paid on time, coverage will continue for such individual until the earliest of:

o   18 months following January 1, 2005. **(However, if the employee has enrolled, or will enroll in Medicare within eighteen months of January 1, 2005 see the discussion below on a possible extended coverage period for the spouse and dependents.)**;

o   the date such individual becomes covered under any other employer funded group health plan either as an employee or as the spouse or dependent of an employee, except in a pre-existing condition situation (see the discussion below);

o   the date such individual becomes entitled to Medicare benefits;

o   the date the Plan is terminated;

For an employee's spouse and dependents, COBRA continuation coverage may be extended if a second qualifying event occurs within the first period of COBRA continuation coverage. However, in no event will COBRA continuation coverage extend past 36 months from January 1, 2005.

There are certain special circumstances that could extend your period of COBRA coverage, as follows:

## 1.    SOCIAL SECURITY DISABILITY DETERMINATION

An employee or other qualified beneficiary who is determined by Social Security to have been totally disabled at the time the employee left employment may keep COBRA coverage for up to 29 months. To qualify for this special extended COBRA eligibility of 11 months, the individual must report the Social Security disability determination to the Fund Administrator before the initial 18 months of COBRA coverage expires and within 60 days after the date of the Social Security determination. You will be charged [150%] of the applicable premium for each of the extra 11 months of coverage.

Eligibility for this extended COBRA coverage terminates 30 days after the month in which Social Security determines that the individual is no longer disabled, a determination that the individual must report to the Fund Administrator within 30 days after it is made. Be aware that the COBRA eligibility will also end when the individual's Medicare coverage begins, even if that is before the full 29 months have expired or you cease to pay premiums on time.

Remember, if you believe you may or will be eligible for this coverage of up to 11 extra months you must notify the Fund Administrator as indicated above.

Only those qualified beneficiaries (including their eligible dependents) who choose COBRA coverage within the time set for making that election when their Fund coverage first ended, and who keep it in force by paying their premiums on time, can buy this extended coverage.

## 2.    PRE-EXISTING CONDITIONS

A qualified beneficiary who becomes covered under another employer funded group health plan can keep COBRA coverage as well, if the new plan has a limitation or exclusion with respect to a preexisting condition of that qualified beneficiary. If you think you may qualify for this extended COBRA coverage, contact the Fund Administrator. If you qualify, the Fund will coordinate its COBRA coverage with the other plan's coverage based on applicable coordination of benefits rules.

If a qualified beneficiary has overlapping health coverage under this special rule, the Fund will coordinate its COBRA coverage with the coverage the person has under the other employer-funded plan based on the Fund's standard coordination-of-benefits rules, recognizing that for this purpose a former employee who is on COBRA coverage is in the same position as a laid-off or retired employee. In no event will the total of payments from both plans for a particular service be more than 100% of the allowable cost for that service.

As with the new COBRA extension for disabled qualified beneficiaries, only those qualified beneficiaries (including their eligible dependents who choose COBRA coverage within the time set for making that election when their Fund coverage first ends, and who keep it in force by paying their premiums on time, can buy this overlapping coverage. So, if you will lose Fund coverage because of a job change, before deciding whether to take COBRA you may want to check to see if the health plan that will be available at the new job has any restrictions or exclusions that could affect coverage for your family's preexisting health conditions.

3.   **EMPLOYEE'S MEDICARE ENTITLEMENT**

If a Plan Participant enrolls in Medicare and there is, at that time or later, a qualifying event that would cause that person's covered spouse and dependents to lose health coverage from the Fund, those family members can maintain COBRA coverage for up to 36 months from the date the Participant enrolled in Medicare, or later if their COBRA coverage would last longer than that under the regular rules.  Also, if a Participant and the Participant's family go on COBRA coverage after losing Fund coverage because of the termination of the Participant's service or reduction in hours and the Participant later enrolls in Medicare, the family's eligibility for COBRA coverage will be extended to up to 36 months from the date of the termination of service or reduction in hours.

Of course, as with the other special extensions of COBRA eligibility, only those who choose COBRA coverage within the time set for making that election when their Fund coverage first ends, and who keep it in force by paying their premiums on time, can buy this extended coverage.

Once your COBRA continuation coverage terminates it cannot be reinstated.   You and your eligible dependents can only become covered under the Plan again if you return to covered employment and meet the eligibility requirements.

*YOU SHOULD RESPOND IMMEDIATELY TO ASSURE CONTINUITY OF HEALTH COVERAGE AND AVOID POSSIBLE CLAIM DENIAL IF COVERAGE IS CANCELLED WHILE YOU DECIDE.  NO CLAIM INCURRED DURING THIS ELECTION PERIOD WILL BE PAID UNLESS YOU ELECT AND PAY FOR THIS COVERAGE ON A TIMELY BASIS.*

If you or any member of your family are choosing COBRA coverage, please complete the attached Election Form, and return it to the Fund Administrator.

If you have any questions, you should contact the Fund Office as soon as possible, as time is very important in making a decision.

Sincerely,

Robert A. Costello
Fund Administrator

RAC:naw

**BY CERTIFIED MAIL**