UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DANIEL PAULINO,                                  :
                                                 :         MEMORANDUM DECISION
                            Plaintiff,           :              AND ORDER
                                                 :
         -against-                                :         06 Civ. 53 (GBD)
                                                 :
THE NEW YORK PRINTING PRESSMEN'S                 :
UNION, LOCAL TWO, and THE BOARD OF               :
TRUSTEES and ROBERT COSTELLO,                    :
Administrator, of the PRESSMEN'S                 :
PUBLISHER'S BENEFIT FUND,                        :
                                                 :
                            Defendants.          :
------------------------------------------------------------x
GEORGE B. DANIELS, District Judge:

In the second of two separately filed lawsuits,[1] plaintiff Daniel Paulino brings suit against defendant The New York Printing Pressmen's Union, Local Two (the "Union"), alleging race and national origin-based discrimination and retaliation, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981. Plaintiff also alleges that his Union membership was suspended without a full and fair hearing, in violation of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411 et seq. The Union moved to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), and/or for summary judgment, pursuant to Fed. R. Civ. P. 56.

---

[1] The first filed lawsuit was filed with this Court on May 12, 2005, against the Union and the New York Post. Paulino v. New York Printing Pressmen's Union, Local Two, No. 05 Civ. 4647 (GBD) (Paulino I). Rather than attempting to amend the complaint for a second time, plaintiff filed this second action on January 4, 2006, against the Union and defendants Board of Trustees and Robert Costello. This Court subsequently dismissed the amended complaint in the prior action on January 31, 2006. The Board of Trustees and Robert Costello's unopposed motion to dismiss the claims against them was granted on April 5, 2006.

**BACKGROUND**

Plaintiff, a Hispanic male, was hired by the New York Post as a Junior Pressman in July 2000. Compl. ¶¶ 18-19. He became a member of the Union—which is the collective bargaining agent for certain New York Post employees—in September 2000. Id. at ¶¶ 13, 24. Once a member of the Union, plaintiff, like all other Union members, became eligible for placement on the "Revisions List." Id. at ¶ 25. Placement on the Revisions List determines the order of layoffs, preferences to work additional shifts at other newspapers, and selection for vacation and other personal days off. Id. at ¶ 27. The list is also used to determine an employee's eligibility for advancement to Journeyman status.[2] Id. at ¶ 26. An employee's position on the Revisions List is determined using a formula that has existed for at least fifty (50) years, and is based on the number of shifts that the employee works as a pressman during certain periods of time. Heffernan Decl. ¶¶ 9-12; Compl. ¶ 29. Plaintiff alleges that he was wrongly, and intentionally, placed on the Revisions List by the Union below two Caucasian employees with less seniority, and that his complaints to this effect were ignored by Union leadership. Compl. ¶¶ 31-37. He also claims that his union membership was suspended after his complaints. Id. at ¶¶ 38-39.

In March 2004, employee contributions to the Publisher's-Pressmen's Welfare Fund ("Welfare Fund")—which provides hospital, medical, pharmacy, and related benefits to employees of participating employers in the newspaper industry in New York City—were

---

[2]There are two classifications of employees that work in a newspaper's pressroom. Declaration of John Heffernan ("Heffernan Decl.") (attached to the Declaration of Barry I. Levy ("Levy Decl."), Ex. 2) at ¶ 4. "Journeymen" are more experienced employees, while "Juniors" are the employees with less experience. Id. Except for rates of pay, Journeymen and Juniors receive the same contractually guaranteed benefits, including vacation, pension, and welfare benefits. Id. at ¶ 15.

2

increased due to rising healthcare costs.  Declaration of Robert A. Costello ("Costello Decl.") (Levy Decl. Ex. 1) at ¶¶ 2, 5.  To help alleviate the economic impact of the rate increases, the Welfare Fund adopted a "cafeteria plan," pursuant to Internal Revenue Code § 125, so that contributions could be automatically deducted from participants' paychecks on a pre-tax basis.  Id. at ¶ 6; Compl. ¶ 52.  All participants, including plaintiff, were informed that contributions to the Welfare Fund could be made directly by the individual on an after-tax basis, or withheld on a pre-tax basis by participating in the cafeteria plan, and that the failure to make contributions using either method would result in the termination of the benefits.  Costello Decl. ¶ 8, Ex. D.  Plaintiff refused to enroll in the cafeteria withholding plan, and he did not make the contributions himself.  Costello Decl. ¶ 9; Compl. ¶ 54.  As a result, plaintiff's health insurance was interrupted.  Costello Decl. ¶ 9, Ex. F.  Plaintiff alleges that "[t]he cancellation of [his] Health Insurance was done to retaliate against him for his refusal to enroll in the § 125 Pre-Tax Plan."  Compl. ¶ 67.  He also alleges that "the Union suspended [his] Union membership based upon his election not to enroll in the cafeteria plan."  Id. at ¶ 55; Paulino Aff. ¶ 20.

**MOTION TO DISMISS AND FOR SUMMARY JUDGMENT**

In deciding a motion to dismiss, the Court must "accept as true the complaint's factual allegations and draw all inferences in the plaintiff's favor."  Cleveland v. Caplaw Enter., 448 F.3d 518, 521 (2d Cir. 2006) (citation and alterations omitted).  Dismissal is only appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Field Day, LLC v. County of Suffolk, 463 F.3d 167, 192 (2d Cir. 2006) (citation omitted).  Conclusory statements, however, "are not a substitute for minimally

3

sufficient factual allegations." E & L Consulting, Ltd. v. Doman Industries Ltd., 472 F.3d 23, 28 (2d Cir. 2006) (citation omitted).

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); June v. Town of Westfield, New York, 370 F.3d 255, 257 (2d Cir. 2004). There is no genuine issue of material fact "unless the evidence is such that a reasonable jury could return a verdict for the nonmoving party." New York Stock Exchange, Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 554 (2d Cir. 2002) (citation omitted). In deciding a motion for summary judgment, the Court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor. Schneider v. Feinberg, 345 F.3d 135, 144 (2d Cir. 2003).

### A. Discrimination Claim

Plaintiff claims race and national origin-based discrimination in violation of Title VII and 42 U.S.C. § 1981. He alleges that "Plaintiff and other similarly situated minority Hispanic and African-American employees were incorrectly placed at a lower seniority than junior Caucasian employees." Compl. ¶ 31. To avoid summary judgment on his discrimination claims, whether under Title VII or section 1981, plaintiff must establish a prima facie case of discrimination as set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See, e.g., Joseph v. Leavitt, 465 F.3d 87, 90 (2d Cir. 2006) (Title VII); Hargett v. Nat'l Westminster Bank, USA, 78 F.3d 836, 838 (2d Cir. 1996) (Section 1981). A prima facie case is established by showing (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment

action;[3] and (4) circumstances giving rise to an inference of discrimination. See Demoret v. Zegorelli, 451 F.3d 140, 151(2d Cir. 2006) (citation omitted).

Here, the undisputed evidence regarding the Union's determination of plaintiff's relative placement on the Revisions List cannot establish an adverse employment action nor circumstances giving rise to an inference of discrimination to support a prima facie case. Plaintiff bases his claim solely on his belief that he was placed below two Caucasian members with less seniority. However, the undisputed evidence demonstrates that: (1) placement on the Revisions List is determined using a formula based on the number of shifts worked by an employee as a pressman during certain periods of time; (2) the Union determines the number of shifts an employee works from time records provided to it by the employer newspapers; (3) the New York Post provided the Union with the time records for plaintiff and other Post employees; and (4) according to those time records, plaintiff's position on the Revisions List is correct. See Supplemental Declaration of John Heffernan ("Heffernan Supp. Decl.") ¶¶ 6-7, Ex. B, C & D; Heffernan Decl. ¶ 14; Union's Statement Pursuant to Local Civil Rule 56.1 ("Union's 56.1 Statement") ¶ 13.

Plaintiff was given the opportunity in discovery to review the time records utilized by the Union and the formula applied to all Union members. At oral argument on the Union's renewed motion to dismiss, this Court urged plaintiff's counsel to fully examine those records to determine if plaintiff could validly maintain (1) that those were not the records provided by the

---

[3] The Union argues, in support of its motion, that plaintiff's relative placement on the Revisions List cannot constitute an adverse employment action. Since this Court concludes that plaintiff can show neither an adverse employment action nor circumstances giving rise to an inference of discrimination, the Court need not determine whether a lower placement on the list alone constitutes an adverse employment action.

New York Post, or (2) that the Union misapplied the applicable formula. Plaintiff has been unable to make such a showing. He simply relies on allegations that there is an "inconsistency between the Union's payroll records and Mr. Paulino's payroll records," and that further "discovery might uncover evidence of animus or hostility toward Mr. Paulino on the basis of his race." What plaintiff continues to avoid confronting is that the evidence is undisputed that the Union received the records provided by the employer, and utilized the same formula used in every case to determine the order of placement on the list. This critical threshold issue plaintiff fails to address in his Rule 56.1 statement or his arguments. None of plaintiff's other arguments or further requests for discovery could sustain a discrimination case in light of this undisputed evidence.

The Union provided plaintiff the time records. The Union also provided an explanation of how plaintiff's—and the two white employees'—placement on the Revisions List was calculated utilizing the standard formula applicable to all members.[4] Plaintiff, however, has

---

[4] When a casual employee—*i.e.*, not a Union member—works 110 shifts in a six-month period from either (i) January 1 to June 30, or (ii) July 1 to December 31, that employee is placed on a Shop Priority List. Union's 56.1 Statement ¶ 7. Once on the Shop Priority List, the employee is offered Union membership, and Union establishes that employee's Revisions List "date." Id. ¶¶ 7, 8. To establish the date, the Union looks to the number of shifts worked by that employee during the year before the period in which the employee was placed on the Shop Priority List. Id. ¶ 8. That number, up to 168, has a corresponding date—which is listed in a table—which is the employee's Revisions List date. Id. ¶ 9; Heffernan Supp. Decl. ¶ 4, Ex. A. If an employee worked more than 168 shifts in the previous year, the employee is given a full year's credit for purposes of placement on the Shop Priority List, and then the same procedure outlined above is followed to determine that employee's Revisions List date. Union's 56.1 Statement ¶ 9.

For example, plaintiff earned his Union card on July 1, 2000, meaning he worked 110 shifts in the previous six-month period. Heffernan Supp. Decl. ¶ 7. During the prior year, however, plaintiff worked only 66 shifts. Id.; id. Ex. B. According the table that establishes the Revisions List date, 66 shifts has a corresponding date of August 9. Id. Ex. A. Thus, plaintiff's date was August 9, 1999. Id. ¶ 7.

never alleged that the standard formula was manipulated or applied differently in his particular case. In fact, at the hearing on the Union's motion, plaintiff's attorney acknowledged that Mr. Paulino's records are accurate employer records and that they were accurately transmitted to the Union for their evaluation. See Transcript of Oral Argument, April 5, 2006 ("Tr.") at pp. 27-28. Yet despite this admission, this Court gave plaintiff a further opportunity to review the time records received and utilized by the Union, so he could determine whether he could indeed challenge their accuracy. In an attempt to raise an issue regarding those time records, plaintiff responded by submitting a printout of plaintiff's payroll records which, according to plaintiff, demonstrate that he worked more hours than reflected in the records received by the Union. But these records in plaintiff's possession still fail to raise a genuine issue of fact as to whether the Union routinely utilized the records provided by the employer, or deliberately misplaced plaintiff on the Revisions List under circumstances giving rise to an inference of racial discrimination. He has failed to come forth with any evidence to raise a genuine dispute on this threshold issue.

Plaintiff does not claim that the payroll records in his possession were given to, or relied upon by the Union, when it determined plaintiff's spot on the Revisions List. Thus, even if these payroll records that plaintiff now wants to rely on proved that the time records provided to the Union from the Post were inaccurate, any resulting misplacement of plaintiff on the Revisions List would be the employer's fault, not the Union's. In addition, plaintiff's payroll records reflect shifts that plaintiff worked for the Post in capacities other than as a pressman—shifts that are not counted for purposes of placement on the Revisions List.[5] See Third Heffernan Decl. ¶

---

[5] The relevant work for purposes of placement on the Revisions List is work performed as a pressman in the pressroom. See Declaration of John Heffernan, sworn to May 17, 2006 ("Third Heffernan Decl.") ¶ 4(A). These work shifts are denoted by the numbers 10, 11, or 200 on the

4(A). According to plaintiff's payroll records, in 1999, plaintiff worked 66 shifts as a pressman (from August 15, 1999 to December 31, 1999). Id.; Plaintiff's May 4, 2006 Letter Memorandum, Ex. I. This is the same number of shifts reflected in the Post's time records used by the Union in determining plaintiff's placement on the Revisions List. See Third Heffernan Decl. ¶ 4(A); Heffernan Supp. Decl. Ex. D. Finally, according to the time records provided to the Union by the Post, the placement of the two white employees on the Revisions List is also correct, and plaintiff never contends otherwise. See Heffernan Supp. Decl. ¶¶ 6-7. Thus, plaintiff's payroll records do not conflict with the time records relied upon by the Union.

 Accordingly, there are no circumstances here to demonstrate an adverse employment action, or from which an inference of discrimination can be drawn. Plaintiff does not contend that defendant relied on any different records than were provided by the employer, or utilized any method out of the ordinary to determine his placement on the Revisions List than is used in all other instances. He merely continues to allege that his order of placement on the Revisions List was not determined solely by the total number of hours he worked as a Union member, despite clear evidence which he seeks to ignore and avoid, that such a simplistic formula is not applied to his or any other Union member's placement on the list.

 Since his placement on the list is supported by the evidence, there can be no adverse employment action. Moreover, one cannot reasonably infer racial discrimination based on

---

payroll records submitted by plaintiff. Id.; Plaintiff's May 4, 2006 Letter Memorandum, Ex. I. Plaintiff's payroll records, however, list shifts worked by plaintiff with a corresponding "Pay Type" number other than a 10, 11, or 200. Plaintiff's May 4, 2006 Letter Memorandum, Ex. I. The number of shifts that plaintiff's payroll record indicate that he worked at "Pay Type" 10, 11, or 200 in 1999 is the same—66—as reflected in the time records provided to the Union by the NY Post. Compare id. with Heffernan Supp. Decl. Ex. D.

plaintiff's contention that he should be ahead of two white union members on the Revisions List simply because plaintiff believes he has seniority. Plaintiff cannot merely rely on a separate set of records in his possession not provided by the employer to the Union, and his own "seniority" formula to support his discrimination claim. Plaintiff cannot sustain a prima facie case of employment discrimination under either Title VII or Section 1981, where the evidence remains undisputed that the Union made its placement calculation by utilizing its standard formula based upon the time records provided by the employer. Summary judgment is therefore appropriate.[6]

### B. Retaliation Claim

Plaintiff's Title VII and Section 1981 retaliation claims cannot survive dismissal. A prima facie case of retaliation under Title VII or Section 1981 requires proof that the plaintiff engaged in a protected activity; the employer was aware of this activity; the employer took adverse action against the plaintiff; and a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action. Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 608 (2d Cir. 2006); Lizardo v. Denny's, Inc., 270 F.3d 94, 105 (2d Cir. 2001). Plaintiff never raised a retaliation claim with the

---

[6]Plaintiff was provided both the Union's time records and formula, and given the opportunity, and was urged by this Court, to verify its application. Plaintiff has apparently declined to do so. Instead, he further argues that summary judgment is premature because additional discovery "might uncover evidence of (a) animus or hostility toward Mr. Paulino on the basis of his race[;] (b) the inaccuracy of Mr. Paulino's placement on the list which determines the order of elevation to journeymen status[; and] (c) whether or not the Union's refusal to address Mr. Paulino's complaints were motivated by animus." But as already noted, at the April 5, 2006 hearing on the Union's motion, this Court granted plaintiff a further opportunity to review the time records received and relied upon by the Union, to determine whether plaintiff could claim that those records were not accurate or that the formula was misapplied in this case. Tr. 68-74. Thus, plaintiff has received, and had ample opportunity to investigate the accuracy of, the time records relied upon by the Union, yet he has still failed to even claim a disputed issue of material fact as their correctness.

Equal Employment Opportunity Commission, and therefore any Title VII claim is unexhausted.[7] Plaintiff has not, and cannot, establish a prima facie case of retaliation under section 1981.

To the extent plaintiff claims that his membership was suspended in retaliation for his complaints regarding discrimination in placing employees on the revisions list, there is simply no evidence that plaintiff raised the issue of racial discrimination with anyone in the Union prior to his alleged November 2004 suspension. In fact, the only evidence plaintiff cites to support his allegation that he even complained about his relative placement on the Revisions List—two letters plaintiff sent to the Union President—do not contain any claims of discrimination at all. Rather, the letters are merely requests by plaintiff for an explanation of the formula used to determine placement on the Revisions List.

In addition, to the extent plaintiff claims that "[t]he Union suspended Paulino's Union membership based upon his election not to enroll in the cafeteria plan," that allegation cannot state a retaliation claim because refusing to sign a § 125 form is not a protected activity. See, e.g., Kessler v. Westchester County Dept. of Soc. Servs., 461 F.3d 199, 210 (2d Cir. 2006) (noting that a "protected activity" is one "opposing an employment practice made unlawful by Title VII") (citation omitted); Moore v. Consolidated Edison Co. of New York, Inc., 409 F.3d 506, 508 n.2 (2d Cir. 2005) (stating that retaliation claims are "cognizable under § 1981 where the allegations provoking the retaliation involved racial discrimination") (citations omitted).

---

[7]Filing of a complaint with the Equal Employment Opportunity Commission is a prerequisite to bringing a Title VII claim in federal court. See Williams v. New York City Housing Authority, 458 F.3d 67, 69 (2d Cir. 2006). Although plaintiff did file an EEOC complaint in this case, it focused solely on the Union's alleged discrimination in placing Caucasian employees ahead of minority employees on the Revisions List. See Declaration of Roger Carbo, Ex. A (the EEOC complaint). The complaint says nothing of any retaliatory actions taken against plaintiff.

Finally, even if plaintiff had engaged in a protected activity, he has not alleged an adverse employment action. An adverse employment action is one "that a reasonable employee would have found . . . materially adverse," meaning that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Kessler v. Westchester County Dep't of Social Services, 461 F.3d 199, 207 (2d Cir. 2006) (quoting Burlington Northern & Santa Fe Railway Co. v. White, --- U.S. ----, 126 S.Ct. 2405, 2415 (2006)).

Here, although plaintiff alleges that his Union membership was suspended, he does not dispute the fact that he remained eligible to vote in, and was provided a ballot for, Union elections even after the alleged suspension occurred. Plaintiff's Statement Pursuant to Rule 56.1 ¶¶ 20-21. Nor does plaintiff deny that he continued to pay his Union dues and was eligible to attend and participate in Union meetings and activities. Rather, plaintiff merely alleges that he was denied the right to raise his complaints at the December 6, 2004 Executive Board Meeting "unless and until Mr. Paulino enrolled in the cafeteria plan." Plaintiff's March 22, 2006 Letter Memorandum at 3. Being denied the right to raise complaints at one Executive Board meeting, however, cannot constitute such a materially adverse action that it would dissuade a reasonable worker from complaining about discrimination. Here, plaintiff does not claim that he suffered any other adverse consequences or loss of Union membership.

Plaintiff's retaliation claim therefore fails and must be dismissed.

**C. LMRDA Claim**

Lastly, plaintiff further alleges that his membership was suspended by the Union without the benefit of a full and fair hearing, in violation of the LMRDA. Section 101(a)(5) of the

11

LMRDA provides that "[n]o member of any labor organization may be fined, suspended, expelled, or otherwise disciplined . . . unless such member has been . . . afforded a full and fair hearing." 29 U.S.C. § 411(a)(5). The Union argues that this claim should be dismissed because plaintiff failed to exhaust the Union's internal grievance procedures established by the Union's Constitution and bylaws. The Union further argues that plaintiff's claim must fail because his Union membership was never suspended.

Pursuant to the LMRDA, court's have discretion to require plaintiffs to exhaust internal union remedies before asserting their claim in federal court. See <u>Maddalone v. Local 17, United Broth. of Carpenters and Joiners of America</u>, 152 F.3d 178, 186 (2d Cir. 1998). In exercising that discretion, the courts "must balance the right of union members to institute suit against the policy of judicial noninterference in union affairs." <u>Id</u>. (citation omitted). Factors guiding this inquiry are "(i) whether union officials are so hostile to the employee as to eliminate the chance of a fair hearing; (ii) the adequacy of the internal procedures; or (iii) whether exhaustion would unreasonably delay the opportunity to obtain a judicial hearing on the merits of the employee's claim." <u>Schermerhorn v. Local 100, Transport Workers Union of America</u>, 91 F.3d 316, 325 (2d Cir. 1998) (citations and internal quotation marks omitted). Utilizing available Union grievance procedures should be encouraged.

Under the Union's Constitution, a member "who feels that an injustice has been done to him, shall first appeal to the President, then to the Executive Committee and the Local Union." Declaration of Michael Tortora ("Tortora Decl.") ¶ 8, Ex. A. In addition, the member may then appeal a decision affecting his or her rights to the International Union. <u>Id</u>. Ex. A. Plaintiff maintains that he complied with the Union's procedures by sending two letters to the Union

President, and then one letter to the International Union. But none of these letters addressed the claim that plaintiff seeks to assert here: that his membership was suspended without a full and fair hearing. See Plaintiff's Letter Memorandum, March 22, 2006, Ex. B, C & H. Instead, the letters to the Union President merely seek an explanation of the formula used to determine an employee's placement on the Revisions List. In the third letter to the International Union, plaintiff only complains that he has been denied access to the "mathematical equation," and that the Executive Board at its December 6, 2004 meeting refused to address his concerns with regard to this issue. Id.

In fact, plaintiff did not claim he was suspended or raise his LMRDA claim in this Court until September 5, 2005, when he sought—and was denied—permission to file his proposed second amended complaint in Paulino I. That was ten months after he claims his membership was allegedly suspended, and four months after he originally filed suit. Thus, since plaintiff himself failed to raise this claim in either a Union grievance procedure, or in the two prior complaints he filed in this Court, requiring plaintiff to exhaust his internal Union remedies would not unreasonably interfere with plaintiff's right to institute suit.

More importantly, the Union maintains that plaintiff's membership was never actually suspended, and, as discussed above, plaintiff does not seriously dispute this. Rather, plaintiff merely claims that he was denied the right to speak at an Executive Board Meeting. Moreover, plaintiff admits that he only belatedly learned of his suspension upon his subsequent review of the minutes from the November 1, 2004 Executive Board meeting. He merely asserts that since the meeting minutes state that he was suspended, it must be so. But that does not contradict the Union's position that despite the fact that the minutes erroneously report that four individuals,

including plaintiff, were suspended, plaintiff's membership was never suspended, and he continued to pay dues and enjoy member benefits. It was plaintiff's health insurance that had been automatically suspended due to his failure to sign up for the cafeteria plan or otherwise pay the premiums.[8] Plaintiff claims no other loss of benefits. Finally, plaintiff never alleges that he received any formal membership suspension notice, even though the usual procedure would be for the Executive Board to send a letter to the member notifying the member of a suspension. Tortora Decl. ¶ 5. Accordingly, plaintiff cannot assert a valid or exhausted LMRDA claim.

## CONCLUSION

The Union's motion for summary judgment is GRANTED. All of plaintiff's claims are DISMISSED and this case is CLOSED.

Dated: New York, New York
   May 7, 2007

SO ORDERED:

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge

---

[8] According to the Union, it was the suspension of certain members' health benefits that was discussed at the November 2004 Executive Board meeting resulting from the failure to sign up for the cafeteria plan, not the suspension of plaintiff's Union membership. Union's 56.1 Statement ¶ 18. This accounts for the transcription error in the minutes for that meeting which merely reads "The Executive Board reports D. Paulino [and three other members] are hereby suspended." Plaintiff's May 4, 2006 Letter Memorandum, Ex. G.

14